**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: June 25, 2009**

_____
**CRAIG A. GARGOTTA**
**UNITED STATES BANKRUPTCY JUDGE**

_____

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE WESTERN DISTRICT OF TEXAS
### AUSTIN DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **JERRY DON SUMMERS,** | § | **CASE NO. 08-10837-CAG** |
| Debtor. | § | Chapter 7 |

| | | |
|---|---|---|
| | § | |
| **MEGAN CALLANAN, JEFFREY K.** | § | |
| **MANGUM AND CHRISTY L. MANGUM,** | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | **ADVERSARY NO. 08-1079** |
| | § | |
| **JERRY DON SUMMERS,** | § | |
| Defendant. | § | |
| | § | |

### MEMORANDUM OPINION AFTER TRIAL

This is the decision of the Court after a bench trial held April 9-10, 2009. This proceeding arises in a case referred to this Court by the Standing Order of Reference entered in this District and is determined to be a core proceeding pursuant to 28 U.S.C. §157(b)(2)(I)(determinations as to the dischargeability of particular debts) and (O)(determine an interest of the bankruptcy estate). This adversary proceeding alleges causes of action pursuant to 11 U.S.C. § 523(a)(4) and 11 U.S.C. § 727.

1

The Court is authorized to enter a final judgment in this proceeding under 28 U.S.C. § 1334.

During the course of trial, exhibits were admitted by Plaintiffs Callanan, Jeffrey K. Mangum and Christy Mangum.[1]  Defendant did not admit any exhibits.

Plaintiffs Megan Callanan ("Callanan"),[2] Jeffrey K. Mangum, Christy Mangum (collectively the "Mangums"), and Debtor/Defendant Jerry Don Summers (hereinafter Summers) testified.  In addition, other testifying witnesses were:  Lu Ann Reyes, the sales agent for the Plaintiffs; Ava Zhang, the other buyer for the Mangums' house; and Joe Longton, a real estate broker presenting testimony for Summers.  In reaching its determinations, the Court considered the demeanor and credibility of all witnesses and all exhibits admitted.  The Court also considered the oral arguments of counsel and trial briefs.

Acting as a seller's agent, Summers represented a married couple, Jeffrey and Christy Mangum, who were seeking to sell their house at 3832 Noe Lane, Round Rock, Texas, and Summers acted as a buyer's agent for the Mangums in regards to their purchase of a different home to be built.  During the relevant time of the sale of the Noe Lane house, Summers also acted as buyer's agent for another married couple, Chunho Chen and Zuohui Zhang.  The Callanan sisters were represented by a buyer's agent, LuAnn Reyes.  The dispute arises from the fact two buyers, the Callanans and Mr. Chen and Ms. Zhang, submitted purchase offers on the Noe Lane property during the same general time frame, and whether the Callanans' offer was accepted and became a binding contract or whether it was rejected such that the Mangums could consider the Chen/Zhang offer (and they did consider the Cheng/Zhang offer and accepted it).  Callanan ultimately purchased the Noe Lane house after the Chen/Zhang contract was withdrawn after Callanan sued to enforce her purchase contract.  In this adversary proceeding, Callanan claims she was damaged by the actions of Summers and she should be reimbursed the reasonable and necessary attorney's fees she had to pay to enforce her purchase contract on the home, as well as the additional travel she had to make to Austin from her home in California to enforce her contract.  The Mangums seek damages for money lost on the

---

[1] These exhibits are P 1, 2, 3, 4, 5, 7, 10 (limited purpose of notice of intent to sue against Mr. Summers), 11, 12, 13, 15, 19 (limited purpose of showing billing- Mr. Summer's request), 20 (with redactions as stated on the record), 21, 23, 24, 25, 26, 27, 29, 30, 31, 34, 36, 37, 38, 40, 41, and 42 (limited purpose of reasonableness of the fees).

[2] Although Diedre Callanan, the sister of Megan Callanan, was a buyer with Megan Callanan on the purchase contract for the Noe Lane property, Diedre is not a plaintiff to this suit.

purchase of another home they were pursuing, but could not buy because of the delay in selling the Noe Lane home, and for mental anguish and other damages caused by the ordeal.

The Mangums and Callanans contend that Summers' bad acts constitute fraud, breach of fiduciary duty, tortuous interference with contract, breach of contract, and/or deceptive trade practices, and other bad conduct prohibited by the Texas Real Estate License Act, Texas Occupations Code, Chapter 1101, Section 1101.652(a)(3) or (b), or 1101.653(1), (2), (3), and/or (4). They seek to have the amounts owed them held non-dischargeable under § 523(a)(4). Additionally, they have made an objection to Summers's discharge under § 727.

In response, Summers contends there was no enforceable contract between the Callanans and the Mangums, and thus, the Chen/Zhang contract should have been allowed to proceed. Alternatively, he argues he was due his 3% commission for representing the Mangums in the sale of the Noe Lane property. Summers counters that he acted honestly, did none of the alleged bad acts, and placed the interests of the Mangums first in his dealings with potential buyers of the Noe Lane house. He argues he had no fiduciary duty to Callanan. In sum, he asserts he caused no damages to Plaintiffs.

As more fully stated below, the Court finds that there was no enforceable contract between the Mangums and the Callanans for the purchase of the Noe Lane, such that the Mangums were free to accept the offer from Mr. Chen and Ms. Zhang. However, after litigation ensued, Mr. Chen and Ms. Zhang withdrew their contract, allowing the Callanans' contract to close. As detailed below, Summers is to be discharged from personal liability for all damages alleged. Additionally, Plaintiffs failed to present any evidence to establish an objection to discharge under § 727 and that claim for relief will be denied. The Court will grant a take nothing judgment against Plaintiffs.

The following constitutes the Court's findings of fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

**FINDINGS OF FACT**

1.     The parties are properly before the Court.

2.     Summers has been a Texas-licensed real estate broker (license number 342145) and a Texas-licensed real estate agent (license number 342145) at all times relevant in this suit.

3.      The Mangums were shopping for a new home in May of 2005. They visited a subdivision where new homes were being built by Kimball-Hill Homes. They spoke with an on-site sales representative and located a lot and selected a floor plan for a home they wanted to have built.

4.      The Mangums owned an existing single family home located at 3832 Noe Lane, Mayfield Ranch, Round Rock, Texas, 78681 (the "Property") that they needed to sell in order to qualify for the purchase of the new home.

5.      The Mangums owned the Property on September 29, 2005 through its sale to Callanan on November 29, 2005.

6.      An on-site sales representative for Kimball-Hill Homes referred the Mangums to Summers as a real estate broker who could help them sell their existing home.

7.      The Mangums called Summers to inquire about his services. Summers met with the Mangums in their home, prepared a market analysis, and explained the various services he offered.

8.      In May 2005, Summers entered into an agreement with the Mangums to represent them as a real estate broker/agent to assist them in the sale of the Property.  That listing agreement was not admitted into evidence.

9.      Summers was the listing agent and seller's broker for the Mangums in connection with the sale of the Property at all times relevant in this suit.

10.     Summers was the buyer's agent for the Mangums in connection with the purchase of a new Kimball-Hill home at all times relevant in this suit.

11.     Prior to signing the listing agreement with Summers, the Mangums had listed the Property for sale with another broker but had not been successful in selling the Property.

12.     Summers listed the Property for sale at the Mangum's request through the Austin Board of Realtor's Multiple Listing Service for the price of $214,950.00.

13.     Plaintiff Megan Callanan and her sister Deirdre Callanan were seeking to purchase a single-family dwelling in Austin, Texas.

14.     The Callanans were represented by buyer's agent LuAnn Reyes ("Reyes"). Reyes was the agent for Megan Callanan and Deirdre Callanan at all times relevant in this suit

15.     On September 29, 2005, the Callanans submitted an offer through Reyes to Summers offering to purchase the property from the Mangums for $200,000.00.

16. That same day, Summers called the Mangums to discuss the offer. Mr. Magnum told Summers that the offer was too low and that they would consider an offer of $211,950.00.

17. Summers then called Reyes and told her that the Callanans' offer was too low but that the Mangums would consider an offer of $211,950.00. Reyes told Summers that she would relay the message to the Callanans and that she would call Summers back.

18. Later that day, Reyes called Summers and told him that the Callanans would increase their original offer to $211,950.00.

19. Summers then called Mr. Magnum to inform him that the Callanans had agreed to raise their offer to $211,950.00 and set up a meeting the next morning, Friday, September 30, 2005, with the Mangums. All communication regarding what price was acceptable to the parties was verbal up to this point.

20. On Friday morning, September 30, 2005 at approximately 9:00 a.m. Summers received a phone call from one of the Mangum's neighbors, Mr. Chunho Chen ("Chen"), requesting to see the Mangum's house. Summers told Chen that the Mangums had an offer on the Property, that he was presenting the offer to the Mangums at 10:00 a.m., and that Mr. Chen could meet Summers to view the Property at that time.

21. On Friday morning, September 30, 2005 at approximately 9:00 a.m., Summers informed Chen and his wife Zuohui Zhang that the Property was still available for sale.

22. Mr. Chen viewed the Property at approximately 10:00 a.m. on September 30, 2005.

23. On Friday morning, September 30, 2005 at approximately at 10:00 a.m., Summers met with the Mangums to present the Callanans' original $200,000 offer. The Mangums countered the Callanans' offer by striking through the $200,000 number on the purchase contract and increasing the purchase price to $211,950.00. Both Mr. and Mrs. Mangum initialed the change on the contract.

24. Chen left the Property without expressing any intention of making an offer at that time.

25. Summers faxed the $211,950 counter-offer to Reyes on September 30, 2005.

26. Reyes was out of the office until late that afternoon. Once in the office, Reyes forwarded a "pdf" of the Mangums' counter-offer to the Callanans about 6 p.m. on September 30, 2005.

27. At about the same time, Summers spoke with Reyes and asked Reyes to fax him a copy of the contract (the counter-offer) once it had been signed by the Callanans. Reyes told Summers she

was gone from the office for the day but could have her clients fax it directly to him.

28.     Sometime prior to or about 10:00 a.m. on Saturday, October 1, 2005, Summers talked by phone to Reyes.  Summers asked where the contract was that had been signed by Callanan.  Reyes informed Summers that Callanan was faxing it directly to Summers.  Reyes testified that, in this conversation, Summers gave her no indication that the Mangums were going to rescind their counter-offer.

29.     Mr. Chen called Summers at approximately 10:00 a.m. on Saturday, October 1, 2005 to tell him that he wished to make an offer to purchase the Mangum's home.  Later that morning, Summers went to Chen's home for Chen to sign a purchase offer.

30.     About 10:00 a.m. on Saturday, October 1, 2005, Reyes called Callanan to check on the status of Callanan's returning the signed contract.  Callanan informed Reyes that Summers' fax machine did not work.  Reyes gave Summers' cell phone number to Callanan who then called Summers on his cell phone.  Callanan called  Summers while he was meeting Chen. Summers told Callanan that there was no contract and that she needed to call Reyes.  Also, Summers provided Callanan with a fax number that went to Summers' home office.  Sometime thereafter, Callanan called Reyes and informed her that Summers had told her there was no contract.

31.     Sometime prior to about 11:30 a.m on Saturday, October 1, Summers called the Mangums to inform them that he had not received a signed contract from the Callanans and that Chen wanted to make an offer to purchase her home. Summers explained his feeling that the Callanans might be negotiating to purchase other properties in the area and might not be sincere about purchasing the Property. During this conversation, Summers and Mr. Mangum may have discussed the need for a statement of rescission of the counter-offer to be sent to the Callanans, or at least, because the Mangums believed the Callanans were not pursuing the purchase, they considered that nothing further was needed to be done.

32.     Shortly before 11:00 a.m. on Saturday October 1, 2005, Summers sent a facsimile transmission to Reyes which stated that "Sellers have advised me they wish to withdraw their counter at this time. Thanks, JD."

33.     While meeting with Mr. Chen and Ms. Zhang, Summers told them that he had not received the contract back from the prospective purchaser, that the listing was still active, and the Mangums

could consider an offer.

34.    On Saturday, October 1, 2005 about noon, Summers received the Chen/Zhang written offer to purchase the Property for $212,100.00 with Summers acting as broker/agent for Mr. Chen and Ms. Zhang .

35.    About noon or later on Saturday, October 1, 2005, Summers had a telephone conversation with Reyes during which he informed her that he had sent a written retraction of the Mangums' counter-offer via Reyes's facsimile machine.

36.     Sometime after 3:30 p.m. on Saturday October 1, 2005, Summers received by fax on his home fax machine a copy of the contract that had the $211,950 purchase price initialed by both Mangums and now signed by the Callanans.

37.    Summers called Reyes around 4:30 p.m. and told her that he had finally received the signed contract from the Callanans. He advised her that because the Mangums had previously rescinded their counter-offer to Callanan, the $211,950 Callanan contract would be considered an offer.  He advised her that another offer had been received; gave her the opportunity to allow her clients to revise their offer; told her that he would be presenting the new offer to the Mangums the next day; and asked whether she wanted him to resubmit the Callanans' offer to the Mangums at that time.

38.    Ms. Reyes responded by saying she thought the Callanans had a valid contract with the Mangums and they did not want to revise anything, and told him to resubmit the contract.

39.    Summers presented both the Chen/Zhang offer and the Callanan offer the next afternoon on Sunday, October 2, 2005 at approximately 2:00 p.m.  The Mangums chose the Chen/Zhang offer of $212,100 because Mr. Chen and Ms. Zhang were more qualified buyers in that they were putting more money down on the purchase price and were local buyers.

40.    Summers would receive more in terms of total commission through the sale of the Property to Mr. Chen and Ms. Zhang because he was the only broker involved in that transaction than through the sale to the Callanans.  Summers did not tell the Mangums that he was also acting as the broker and/or agent for Mr. Chen and Ms. Zhang.

41.    Summers became aware that the attorney for the Callanans had sent the Mangums a demand letter insisting that the sales contract for the Property between the Mangums and the Callanans be enforced on or about October 18, 2005.

42.     Callanan filed a lawsuit against the Mangums, Summers, and the then unknown buyers (Mr. Chen and Ms. Zhang) in Williamson County District Court and filed a Lis Pendens in the Williamson County Real Property records on or about October 21, 2005 to stop the sale to Mr. Chen and Ms. Zhang and to obtain specific performance of the contract between the Mangums and Callanan.

43.     A real estate sales closing on the Property regarding the contract Summers brokered between the Mangums and Mr. Chen and Ms. Zhang was set to occur on October 28, 2005.

44.     The real estate sales closing on the Property regarding the contract Summers brokered between the Mangums and Chen/Zhang did not occur because of the Lis Pendens filed against the property.

45.     Chen/Zhang subsequently agreed to terminate their contract with the Mangums.

46.     On November 11, 2005, Summers signed a release prepared by the title company related to contract on the Property that he brokered between the Mangums and Mr. Chen and Ms. Zhang.

47.     The real estate sales closing on the Property regarding the contract Summers brokered between the Mangums and Callanan took place on November 29, 2005.

48.     Callanan purchased the Property from the Mangums for the $211,950 price.

49.     Callanan leased the Property back to the Mangums. At the time of trial, the Mangums were renting the Property from Callanan.

50.     In order for the November 29, 2005 closing to occur, Summers required payment to him of a 3% commission, or approximately $6,358.50, which amount was deducted from the sales proceeds to be paid to the Mangums. The Mangums sent a letter notifying the title company that they would not contest the title company's paying this commission to Summers but that they did not agree he should be paid this money and would pursue reimbursement of the money from Summers through litigation.

51.     A 3% commission of $6,358.50 was paid to Reyes at closing, which amount was deducted from the proceeds to be paid to the Mangums.

52.     According to the practice in the business, after a purchase offer contract is fully executed (e.e., any changes have been initialed), the broker or agent representing either the sellers or the buyers can take the contract and the earnest money to a title company, have it received ("receipted"),

and then the parties consider that the contract is formed and enforceable.

53.    Callanan had sent by FedEx the earnest money due under the purchase contract for a Friday, September 30, 2005 delivery at Reyes's home. No other evidence was produced of what happened to the earnest money.

54.    At about the time the listing agreement was signed, Summers and the Mangums had discussed the Mangums entering a guaranteed buy-out program, in which, if no buyer for the Property was obtained within 60 days of listing it for sale, Summers would buy the Property at a specified price. Summers testified that this program did not fit the Mangums' situation because the Kimball-Hill home would not be completed by the program's deadline. There was no evidence produced that the Mangums were in a guaranteed buy-out program with Summers.

55.    The Mangums were in a move-up program, which was part of the listing agreement, in which Summers agreed to waive the listing agent's ½ portion of the 6% commission on the sale of the Property if the Mangums closed on the purchase of a new Kimball-Hill home in which Summers was compensated as the buyer's agent. Under the agreement, Summers would be paid a 3% commission as the selling agent for the Property if no second home was purchased. No second home was purchased, so Summers was due a commission on the sale of the Property.

56.    There was no evidence that Mangums did not owe a 3% commission to Summers as the seller's agent.

57.    Callanan submitted as her damages the attorney's fees she incurred in obtaining the purchase of the Property and the cost of four trips to Austin. Summers stipulated as to the reasonableness of the attorney's fee incurred by Callanan's attorney, Mr. Watt, through November 22, 2005, which was $17,679.00 as shown by Exhibit P-42. Summers did not stipulate as to the allowance of the fees.

58.    The Mangums testified that their damages were $3000 they paid in upgrade fees for certain amenities or finishes they wanted in the Kimball-Hill home that they were not able to buy, $500 paid to an attorney that they incurred in Callanan's suit against them, mental anguish they suffered and which Mrs. Mangum believes sent her to the emergency room due to stress to check the status of her pregnancy (although the baby was fine), and Mr. Mangum took off several weeks of work to handle the situation, including packing their things.

59.     At all relevant times to this suit, there was no fiduciary relationship between Summers and Callanan.

60.     Callanan was not damaged by the payment of the 3% commission to Summers.

61.     Callanan was not damaged by Summers's actions.

62.     The Mangums weres not damaged by the payment of the 3% commission to Summers.

63.     The Mangums were not damaged by Summers's actions.

64.     Callanan and the Mangums produced no evidence of grounds on which to deny Summers a discharge.

65.     Defendant has waived any claim to a recovery of attorney's fees.

## CONCLUSIONS OF LAW

1.     Courts have determined that the party seeking an exception to discharge bears burden of proof as to nondischargeability of the debt. <u>Fields v. Hartford Casualty Insurance Co.</u>, 926 F.2d 501 (5th Cir.), <u>cert. denied</u>, 502 U.S. 938 (1991). Here, the Mangums and Callanan bear the burden of proof to present evidence showing the debt Summers owes them should survive bankruptcy. Also, the United States Supreme Court has stated that the plaintiff must prove the exception by a preponderance of the evidence. <u>Grogan v. Garner</u>, 498 U.S. 279, 287 (1991). Thus, the Mangums and Callanan must present an amount of evidence showing that is it more probable than not that the factors of the § 523 subsection they have alleged are met.

Plaintiffs have a stiff burden to meet. A bankruptcy court is prohibited from reading general allegations to find a claim objecting to the dischargeability of a particular debt because "[c]onsistent with the Code's basic purpose of 'reliev[ing] the honest debtor from the weight of oppressive indebtedness and permit[ting] him to start afresh,' . . . exceptions to discharge are to be construed narrowly." <u>Hickman v. State of Texas</u>, 260 F.3d 400, 404 (5th Cir. 2001) (citations omitted). Thus, without satisfactory proof of each element of the cause of action, judgment must be entered for Summers.

2.     To be enforceable, a contract for the sale of real property must comply with the statute of frauds, which means it must be "in writing and signed by the party to be charged, must be complete

10

within itself in every material detail, and must contain all the essential elements of the agreement, so that the contract can be ascertained from the writing without resorting to oral testimony." **Lewis v. Adams,** 979 S.W.2d 831, 834 -835 (Tex. App.-Houston [14 Dist.]1998, no pet.) (citing **Cohen v. McCutchin**, 565 S.W.2d 230, 232 (Tex.1978) and Tex. Bus. & Com. Code Ann. § 26.01)). "A valid and enforceable contract is formed by an offer, an acceptance, a meeting of the minds, and an expression of the terms with sufficient certainty so that there is no doubt regarding the parties' intentions." **Muzquiz v. Vasquez,** No. 04-06-00588-CV, 2007 WL 2479659, at *2 (Tex. App.-San Antonio Sept. 5, 2007, no pet.) (quoting **MG Bldg. Material, Ltd. v. Moses Lopez Custom Homes, Inc**., 179 S.W.3d 51, 61 (Tex. App.-San Antonio 2005, pet. denied)). Additionally, "[c]ontracts require mutual assent to be enforceable. Evidence of mutual assent in written contracts generally consists of signatures of the parties and delivery with the intent to bind." **Baylor University v. Sonnichsen,** 221 S.W.3d 632, 635 (Tex. 2007) (citing **T.O. Stanley Boot Co. v. Bank of El Paso**, 847 S.W.2d 218, 221 (Tex.1992) and **Angelou v. African Overseas Union**, 33 S.W.3d 269, 278 (Tex. App.-Houston [14th Dist.] 2000, no pet.)) Without mutual assent, there was no binding written contract. **Id.** "It is elementary that an acceptance must not change or qualify the terms of an offer; if it does, there is no meeting of the minds between the parties because the modification then becomes a counteroffer." **Lewis v. Adams**, 979 S.W.2d 831, 834 (Tex. App.-Houston [14 Dist.]1998, no pet.) (citing **United Concrete Pipe Corp. v. Spin-Line Co.**, 430 S.W.2d 360, 364 (Tex.1968)). "The modification made, however, must be material in order to qualify as a rejection of the original offer and to constitute a counteroffer." **Id.** (citing **Gilbert v. Pettiette**, 838 S.W.2d 890, 893 (Tex. App.-Houston [1 st Dist.] 1992, no writ); **MTrust Corp. N.A. v. LJH Corp**., 837 S.W.2d 250, 254 (Tex. App.-Ft. Worth 1992, writ denied)). Additionally,

> [A]n offer to sell real estate, even though it be evidenced by a written contract duly signed by the seller and delivered into the possession of the purchaser, may be withdrawn by the seller so as to prevent the proposed contract from becoming effective, provided the purchaser is properly notified of such withdrawal before he has signed the contract and properly communicated his acceptance thereof to the seller.

**Antwine v. Reed,** 194 S.W.2d 614, 617 (Tex. Civ. App.1946), *rev'd on other grounds*, 145 Tex. 521, 199 S.W.2d 482 (Tex. 1947).

In **Antwine**, the appellate court determined that the buyer, Reed, had an enforceable purchase

contract when he went to the office of the selling bank's agent with the intent of delivering a signed copy of the contract and the required earnest money but was unable to do so because the agent was out due to illness, and his act occurred prior to the agent's informing Reed of the bank's withdrawal of its offer to sell the land. *Antwine v. Reed*, 194 S.W.2d at 617. The Texas Supreme Court found differently, holding there was no contract to sell the land between the parties. *Antwine v. Reed*, 145 Tex. 521, 527, 199 S.W.2d 482, 486 (Tex. 1947). Although there was sufficient evidence to support the prior courts' finding that Reed had signed the contract before learning of the bank's revocation of the offer for sale, Reed had not tendered the earnest money prior to learning this information; thus, Reed had not accepted all of the proposed contract's terms prior to learning of the withdrawal. *Id.* at 526, 199 S.W.2d at 485. "The mere signing of the contract without a deposit of the earnest money was not an acceptance of the written proposal of the bank." *Id.*

In May 2005, the Mangums offered the Noe Lane house for sale at $214,950. On Thursday, September 29, 2005, through Reyes, the Callanans submitted a residential contract to Summers for the Mangums, offering to pay $200,000. The Mangums verbally rejected this offer. Then, through conversations with their agents, each side learned that the other would accept and pay $211,950 for the home. The next day, the Mangums took the residential contract submitted by the Callanans and which contained the Callanans' $200,000 purchase price, marked out the $200,000 sales price and wrote in $211,950, and both Christy and Jeff Mangum initialed that new price. This act constituted a counter-offer to the Callanans' original offer. Summers sent this counter-offer to Reyes for the Callanans. The Callanans needed to initial the change and return the fully executed contract to the Mangums to form a contract. However, before the Callanans sent the contract back to Summers, Summers faxed to Reyes the withdrawal of the Mangums' counter-offer. Alternatively, according to local practice, Reyes could have taken the fully executed contract and the earnest money (which earnest money Callanan testified she had sent to Reyes) to a title company, and had this occurred prior to the withdrawal of the counter-offer, this would have created a contract.

Because Summers sent the withdrawal prior to the return of the fully executed contract, there was no contract with Callanan. The Mangums were free to consider either the Chen/Zhang offer or the Callanan offer.[3] They chose the Chen/Zhang offer. Callanan's lawsuit in Williamson County

---

[3] The Callanans did not change any terms, thus, their offer was $211,950.

stopped the sale of the house to Mr. Chen and Ms. Zhang. Mr. Chen and Ms. Zhang later agreed to terminate their contract with the Mangums. Callanan's Williamson County lawsuit delayed the sale of the Property which also delayed the Mangums' receipt of sales proceeds needed to purchase the Kimball-Hill home.

As damages, Callanan seeks the attorney's fees she incurred in obtaining the purchase of the Property through the closing date in November 2005, an amount the parties have stipulated to as reasonable but Summers did not stipulate as to their allowance, the unknown dollar cost of four trips to Austin, and punitive damages. The Mangums seek as damages $3,000 they lost on fees paid on the Kimball-Hill home, $500 paid to an attorney as defendants in Callanan's suit, mental anguish, and punitive damages. However, Summers is not liable for any of these damages because all of the damages flow from Callanan's decision to sue to enforce her "contract" for the Property.

3.      Plaintiffs first asserted a § 523(a)(2)(A) cause of action in Plaintiffs' Amended Complaint; however, this Amended Complaint was stricken from the record of this suit because Plaintiffs did not obtain leave of court prior to filing this pleading. In closing argument, Plaintiffs' attorney argued that they had asserted this cause of action throughout their other pleadings, including their Pretrial Order, by asserting state law causes of action on which the § 523(a)(2)(A) claim was based, and through the testimony presented at trial. Presumably, although Plaintiffs' attorney cited no rule, he made this request to try the § 523(a)(2)(A) issue by consent under Federal Rule of Civil Procedure 15(b), incorporated entirely into Bankruptcy Rule 7015. Although Plaintiffs' attorney could have more clearly made this request to have tried this § 523(a)(2)(A) issue by consent, it was sufficiently stated to place Summers's attorneys on notice, and they did not contest this request. Additionally, Rule 15(b) allows for amendment when an issue is tried by the parties' express or implied consent. As such, the Court will consider this claim.

Under 11 U.S.C. § 523(a)(2)(A), a debt shall not be dischargeable in bankruptcy "to the extent" it is "for money ... obtained by ... false pretenses, a false representation, or actual fraud." ***Archer v. Warner***, 538 U.S. 314, 316, 123 S. Ct. 1462, 1465 (2003); 11 U.S.C. § 523(a)(2)(A). "The Fifth Circuit has distinguished the elements of "false pretenses and false representations" on the one hand, and "actual fraud" on the other." ***In re James Davis (Anthony Wallace v. James P.***

*Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007) (citing *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1292 (5th Cir.1995)).

> The *Davis* court stated:
>
> To prove that a debt is non-dischargeable as having been obtained by false pretense or representation, a creditor must establish (i) the existence of a knowing and fraudulent falsehood, (ii) describing past or current facts, and (iii) that was relied upon by the creditor. *See Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir.1992); *RecoverEdge L.P.*, 44 F.3d at 1292-93. " 'False pretenses' and 'false representations' both involve intentional conduct intended to create and foster a false impression." *Still v. Patten (In re Patten)*, 225 B.R. 211, 215 (Bankr.D.Or.1998) (citation omitted). "The distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement." Id. (citations omitted). . . .
>
> Actual fraud requires the additional proof of the debtor's intent to deceive and a loss by the creditor which is proximately caused by the fraud. *RecoverEdge L.P.*, 44 F.3d at 1293.

*Id.*

The words "false pretenses, a false representation, or actual fraud" in § 523(a)(2)(A) refer to common-law torts, while the words in § 523(a)(2)(B) related a cause of action based upon false statements in writing do not. *Field v. Mans*, 516 U.S. 59, 69, 116 S. Ct. 437, 443 (1995). A plaintiff suing under § 523(a)(2)(A) need not show reasonable reliance on the false statements, but must show justifiable reliance thereon, such that the reliance must be justified given the particular circumstances. *Id.* at 74-75, 116 S. Ct. at 446.

Assuming that Plaintiffs incurred damages for which Summers would be liable, Plaintiffs must prove by a preponderance of the evidence that their damages fall within an exception to discharge such that Summers remains personally liable for the damages despite his bankruptcy filing. They must prove that the damage amounts owed them are nondischargeable because Summers received money [his commission], property, services, . . . by reason of false pretenses, a false representation or actual fraud committed on the Mangums or Callanan. However, no evidence was introduced to show Summers was not entitled to a commission on the sale of the Property. No evidence was admitted to show the Mangums paid any more money in commissions on the sale of the Property because they owed a commission to the seller's agent and to the buyer's agent, whether that buyer's agent was Reyes or Summers. There was no evidence that the Chen/Zhang contract was

not a good contract or that Mr. Chen and Ms. Zhang were not stronger buyers than the Callanans. There was no proof Summers made any false representations or committed fraud regarding any of the potential buyers or their proposed purchase contracts. There was evidence that Summers failed to inform the Mangums that he was the buyer's agent for the Chen/Zhang offer, however, this is insufficient evidence on which to grant a claim under § 523(a)(2)(A). Even if Summers was liable for damages, Plaintiffs failed to submit a preponderance of the evidence proving an exception to discharge under § 523(a)(2)(A) such that he would remain personally liable for these damages after bankruptcy.

4.    Plaintiffs made a § 523(a)(4) in their original Complaint. An action under § 523(a)(4) requires a debt to have been incurred "for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4). The concept of fiduciary under § 523(a)(4) is narrower than it is under the general common law:

> [C]ase authority recognizes that the traditional definition of "fiduciary" is not applicable in defining "fiduciary capacity" under section 523(a)(4). The general meaning of a fiduciary-a relationship involving confidence, trust and good faith-is far too broad for the purposes of section 523(a)(4) . . .. The Supreme Court favors a narrow construction of the term "fiduciary capacity" and defines the term as meaning arising from an express or technical trust.

*In re Davis*, 377 B.R. 836-36 (citing *In re Twitchell*, 91 B.R. 961, 964-65 (D. Utah.1988)); see *Angelle v. Reed (In re Angelle)*, 610 F.2d 1335, 1341 (5th Cir.1980) (in determining whether a trust exists under § 523(a)(4), state law must impose trust-like obligations, and the trust must arise prior to and without reference to the act creating the debt).

One of the claims at issue in *In re Davis* was a § 523(a)(4) claim brought by Wallace, a home owner, against Davis, who was Wallace's real estate agent (and who also was the debtor) for the sale of Wallace's home. The *Davis* court noted that "the mere fact that state law places Mr. Davis and Mr. Wallace in relationship that may have some of the characteristics of a fiduciary relationship does not mean that the relationship is a fiduciary relationship under § 523(a)(4), which requires the existence of express or technical trust." *Davis*, 377 B.R. at 835. Finding that Wallace had not established by a preponderance of the evidence that his claims against Mr. Davis were nondischargeable under § 523(a)(4) of the Bankruptcy Code, the Davis court denied the claim. *Id.* at 835-36. That statement applies here.

15

There was no express or technical trust between Summers and the Mangums such that they have a § 523(a)(4) claim against him. Although the Mangums have presented evidence that Summers was not candid with them because he did not inform them that he represented Mr. Chen and Ms. Zhang in the Chen/Zhang purchase contract, there is no evidence that he did any act within the scope of "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" such that any damages he might owe them would be nondischargeable under this subsection. Summers's position as the seller's broker and listing broker for the Mangums had characteristics of a fiduciary relationship but was not the type of relationship as is required to be a fiduciary relationship under § 523(a)(4). Further, the Plaintiffs did not present, by a preponderance of the evidence, evidence showing such a fiduciary relationship should be imposed. There was no fiduciary duty at all between Callanan and Summers.

In sum, neither the Mangums nor Callanan proved any damages were caused to them by Summers, and all claims made under § 523(a)(2)(A) and § 523(a)(4) are denied.

5.      There is no evidence on which to deny Summers a discharge under § 727. A cause of action under § 727 requires, in general, proof of overall bad acts of a debtor, including such things as evidence of a debtor's intent to hinder, delay or defraud a creditor or an officer of an estate by transferring, destroying, or concealing property, evidence a debtor falsified or multilated records, made a false oath, made a false claim, refused to obey a court order, or did other bad acts described in § 727.

6.      Defendant has waived any claim to a recovery of attorney's fees.

7.      The Court will enter an judgment which incorporates these findings of fact and conclusions of law and grants a take nothing judgment against Plaintiff.

# # #